189 So. 448

**TALBERT v. TALBERT.**

No. 35198.

May 1, 1939.

Rehearing Denied May 29, 1939.

Dudley L. Weber and R. F. Walker, both of Baton Rouge, and J. Bernard Cocke, of New Orleans, for appellant.

W. T. Bennett, of Clinton, for appellee.

HIGGINS, Justice.

The wife instituted this action against her husband for a separation from bed and board on the grounds of various acts of cruelty beginning in 1932 and culminating on June 3rd and 4th, 1938. She also prays for an injunction, a partition of the assets belonging to the community of acquêts and gains existing between them, alimony and attorney's fees.

Defendant denied the charges and averred that his wife was suffering from a nervous condition, which caused their troubles.

The trial judge was of the opinion that the plaintiff had failed to prove her case with reasonable certainty and dismissed the suit. She appealed.

The record shows that the plaintiff, a school teacher, married the defendant, a cattle dealer, on September 6, 1931; that there were no children born of the union and that the community property, both personal and immovable, was appraised in an inventory made in these proceedings for the sum of $13,612.99.

The plaintiff alleged in her petition and on the trial of the case on the merits proved by the testimony of Rosemary Hanks, a girl sixteen years of age and a senior at High School, who lived with the parties litigant, Miss Daisy Bridges, a young lady

employed by the plaintiff as an operator in her beauty parlor and who was a guest in the home when the difficulty took place, and her own testimony, that on June 3, 1938, about 11 o'clock p. m., at the matrimonial domicile, an isolated farmhouse, the defendant cursed, abused and assaulted the plaintiff with a shot gun, without any cause or provocation. They stated that upon the return of the plaintiff from New York, where she visited relatives, after the parties had prepared to retire for the night, the plaintiff remonstrated with the defendant for breaking his promise and permitting Martha Gerald, a twenty-eight year old negro woman servant, to be in their home alone with him during her absence; that he became infuriated, seized his loaded shot gun from behind the door, pointed it at his wife and stated, "G— d—— your soul, I'll blow your brains out"; that the two witnesses became frightened and called to the plaintiff to come into their room, and upon the wife stating to her husband that he could take her life that way if he desired to do so, he called her a "coward" and desisted from further attack; that he kept them awake the remainder of the night by walking around with his shot gun; that sometime after the occurrence, while the girls were in the kitchen eating, he came in and said, "It looks like you girls are hungry"; that the next morning he made coffee and invited them to partake of it; that he loaded a cow on his truck in order to bring it to town, and told Miss Bridges she could ride with him on the truck, apparently for the purpose of taking her to the beauty shop so she could open it; that when he came to the house

with the truck, the wife observed that "Doc" Gerald, a negro tenant farmer and the husband of Martha Gerald, was on the truck; that she demanded to know why "Doc" Gerald and his wife had not left the farm in compliance with her previous orders, whereupon the defendant jumped off the truck, called his wife a "s— o– b——," grabbed her by the neck and stated that if the negroes left, she would also have to leave; that he threatened to have her interdicted or sent to the penitentiary and forcibly dragged her into the house and after closing the door, plaintiff states, he choked her and threw her to the floor; and that Rosemary Hanks, hearing the commotion therein, kicked upon the door until defendant finally opened it and she then observed plaintiff lying on the floor.

The defendant was the sole witness in his behalf and denied the testimony of the plaintiff and her witnesses, stating that he only seized the shot gun after his wife started the row about the colored servant, because she had previously threatened to kill him if he did not keep the negro woman out of the house during her absence, and as a precautionary measure, unloaded the shot gun, placing the two shells in the dresser drawer and the gun under his bed. He stated that the next morning his wife renewed the row and ordered the negroes off the place, and admitted he would not allow her to run the negroes away. He also stated that on previous occasions his wife threatened him with bodily harm if she ever found him in the house alone with

the colored woman and that he told her to keep "her mind out of the gutter."

Both parties and Rosemary Hanks, as well as Dr. E. M. Toler and Sheriff Charles Andrews, stated that on the morning following the difficulty, after the defendant delivered the cow, he requested the sheriff and the doctor to go to the farm with him as he was having serious trouble with his wife. The doctor says that he examined the plaintiff and found no marks of violence on her, but upon hearing her story advised her to get a divorce as he was of the opinion the couple could not live together. The sheriff and doctor testified that plaintiff remarked if they wished to interdict her or send her to the penitentiary, they might proceed, but they found no reason to do so. Defendant explains that his purpose in bringing the sheriff and the doctor to his home was to have them, as friends, advise his wife to behave herself, but their testimony shows that the defendant complained that his wife was suffering from a nervous or mental condition.

It is argued that the testimony of Misses Bridges and Hanks should be disregarded, because the former was an employee of the plaintiff at the beauty parlor and had her commission raised from 40 to 60 per cent. However, this increase was given at an unsuspicious time, or previous to plaintiff's visit to New York and, therefore, before the row, which happened three weeks later. It is said that Miss Hanks was an interested witness because the plaintiff had made a will in her favor. There is no doubt that

this girl was devoted to the plaintiff, who had been very kind to her. Her testimony not only appears to be unprejudiced, but it is impressive and convincing. She is intelligent and a member of a prominent family. These observations also apply to Miss Bridges. We find no reason for disregarding their testimony. This is especially true, in view of the fact that their evidence was corroborated. For instance, "Doc" Gerald stated with reference to the difficulty on the morning of June 4, 1938, that he got as "scared as a rabbit." If there had not been serious trouble, there would have been no reason for him to become frightened nor would the defendant have summoned the sheriff and the doctor. Again, the defendant admitted on this occasion that he placed his hands on his wife's neck in order to force her into the house to "intimidate her." The testimony of the sheriff and the doctor shows that defendant did threaten his wife with interdiction or criminal prosecution and contradicts his explanation that he brought them there only to give friendly advice. Furthermore, the defendant admitted acts of cruelty on two previous occasions. For example, on Thanksgiving Day, 1936, he dashed the remainder of an alcoholic drink from a glass into her face, in the presence of guests and friends, because she playfully blew cigarette smoke in his face. He admitted he shoved his wife, causing her to fall across the bed one night because she nagged him. She testified that he slapped her and knocked her over the bed, because she was restless and could not sleep.

■ After a careful review of the record, it is our opinion that the plaintiff proved, by a clear preponderance of the evidence, the alleged acts of cruelty and is entitled to a judgment of separation from bed and board. R.C.C., Arts. 138–153; Allen v. Allen, 170 La. 100, 127 So. 378; Simpkins v. Simpkins, 168 La. 632, 122 So. 888; Vicknair v. Terracina, 164 La. 117, 113 So. 787; Kemp v. Kemp, 144 La. 671, 81 So. 221.

■ The trial judge allowed the wife alimony of $50 per month, pendente lite. It appears that the husband advanced her this amount while they were living together. Plaintiff has asked that she be awarded a larger sum because her health is impaired. The medical testimony shows that she is suffering from nervousness due to domestic troubles and that this condition will pass with rest and quietude. We, therefore, see no reason to increase the alimony and will award the sum of $50 per month. Lester v. Lester, 160 La. 708, 107 So. 499; Oquin v. Evans, 145 La. 473, 82 So. 587.

■ Plaintiff also prays for attorney's fees. Taking into consideration the value of the community assets, as well as the services rendered, we will allow the sum of $300 for attorney's fees. Gosserand v. Monteleone, 164 La. 397, 113 So. 889; Gosserand v. Monteleone, 159 La. 316, 105 So. 356, 42 A.L.R. 310; Benedict et al. v. Holmes, 104 La. 528, 29 So. 256.

For the reasons assigned, the judgment of the district court is annulled and set aside, and it is now ordered, adjudged and decreed that there be judgment in favor of Mrs. Floye Woods Talbert, plaintiff herein, and against the defendant, Robert Perkins Talbert, decreeing a separation, a mensa et thoro, and dissolving the community of acquêts and gains existing between them.

It is further ordered, adjudged and decreed that there be judgment in favor of the plaintiff and against the defendant, granting her the sum of $50 per month alimony.

It is further ordered, adjudged and decreed that there be judgment in favor of the plaintiff and against the defendant for the sum of $300, for attorney's fees.

It is further ordered, adjudged and decreed that there be judgment in favor of the plaintiff and against the defendant granting a permanent injunction, restraining and prohibiting the defendant from in any manner disposing of, alienating or mortgaging any of the property belonging to the community of acquêts and gains existing between them.

It is further ordered, adjudged and decreed that the case be remanded to the district court for the purpose of effecting a partition of the assets of the community of acquêts and gains existing between the parties; defendant to pay all costs of court.

O'NIELL, C. J., does not take part.